Good morning, ladies and gentlemen. Our first case for argument is United States against Shaw. Mr. Catnall. Thank you, Judge Easterbrook, and may it please the court, Neal Katyal for Rishi Shah, and I reserve three minutes. This case is unlike any other criminal case I've ever seen. The government has conceded that it has improperly restrained millions of Rishi Shah's chosen counsel to withdraw and requiring him to go to counsel he would not have chosen but for the restraint. The government cites no case by any court at any time tolerating such a massive and unlawful restraint. This court should not be the first. As the Chief Justice has said, the right to counsel of choice is the most precious right a defendant has, as the accused might readily give all he owns to defend himself. There are two other reasons for reversal. First, the district court allowed the introduction of wholesale grand jury testimony that the government scripted, and second, the government did not prove the elements of fraud. All three arguments apply equally to Rishi and the other defendant, Ms. Uggerwalt. I'll handle the first two of the arguments and my colleague, Mr. Sokoloff, will handle the last. I'll start with the Sixth Amendment violation. The government here said it was going to take Shaw's money, it took Shaw's money, and had a theory in the indictment of why it's take all the money. In 2019, the government throws, quote, all right title and interest. All right title and interest. At the grand jury, hulking, the government expected, the governed agent was asked, quote, have you reviewed the forfeiture allegations at pages 49-57? Answer, I have. Question, do they truly and accurately list items for which there's probable cause to believe they came from the proceeds of fraud? Answer, yes. That's at SA-198. It took three years for the government to disclose the emails from 2020 saying what they did, the most important of which is the February 18th, 2020 email, which is found at SA-204. Hulking says to the AUSA, quote, we were only able to trace a portion of those assets to the fraud. The remainder is not protected. Now, we objected to this, to the Sixth Amendment Restraint of Choice, the Council of Choice, in January of 2020 on the one ground we knew, which was that there was a pot of about ten million dollars that we claimed was over-restrained. Did the government say in response to that motion anything like, oh, we restrained too much? Nope, they said nothing. And here's... What would you have needed to make an earlier challenge? If we had that February 18th email, well, that would have been enough to put us on notice, absolutely, that they hadn't restrained all that. Of course, if they did that, the government would have never restrained anything in the first place. The only reason we're here is the government had a theory of forfeiture which said they could take everything, and they took everything, but there are internal emails that say something else. And Judge Kirsch, here's, I think, the most telling thing. That February 18th email that I mentioned before that I said you should look at, it was written to the AUSA by Polking. The next day, the AUSA, Madden, files a brief responding to William Burke's motion for Council of Choice. Did anywhere in that email, to me, in that brief, did Madden say anything to inform the court about Polking's email? Nope. He doesn't contact Burke. He doesn't tell the court. He does nothing. He's sitting on an email that says, we have over-restrained, and he knew at that very time, Burke is saying, I'm gonna have to withdraw because you guys have taken all of Shaw's money. That was the whole point of that $10 million motion. Mr. Kotel, you have a finding by the district court, and correct me if I'm mistaken, that the error by the government was unintentional. There was no deliberate misconduct or fraudulent misconduct or anything like that. It's the fruit of a mistake. It's a right-hand, left-hand problem. My question is, was your client positioned just from the face of the indictment or the protective order from being able to detect this? So the answer to that is no, and you know, we obviously do disagree for purposes of the Fifth Amendment, as our brief says, with that judge's time. On the grand jury testimony, I understand. But for the Sixth Amendment purposes, it doesn't matter. Our argument is the government over-restrained money. It had a concrete, measurable impact on Shaw's counsel of choice. It meant that his first choice counsel, Burke, had to withdraw. Now, with respect to your question about were we on notice or something, absolutely not. Let's take a look at what the record revealed during that 2020 set of events. Holking told the grand jury that she, quote, reviewed the forfeiture allegations in the indictment, and they truly and accurately listed items for which there is probable cause. They came from the proceeds of fraud. That's at S.A. 198. So that's the way that they told the grand jury that they had the ability to restrain everything. And even the district court admitted this at page S.199. It was clear, though, wasn't she, in the grand jury testimony that the nexus or the connection was in connection with the proceeds of the J.P. Morgan Chase loans and the equity raise? Absolutely not. I agree with you. That's what the district court found. That's not what the underlying material says. So it's true. Holking mentioned the equity raise as well as the capital loans, but she mentioned them as examples, not as exhaustive things. So the relevant language is at S.A. 198, and it says that those were illustrative examples, that the restraint was, quote, not limited to the amounts in the indictment. So, sure, she offered up two examples, but she said these are only examples. These are not, they're not exhaustive. And indeed, at the very same time, she is saying we have the ability to take all right title and interest and even saying we have probable cause to do so. She's asked point blank these questions and that's her answer. So I think there was no way that we could have been on notice for that. Indeed, by the way, the court itself excuses the government for this exact thing, even though it's their theory of forfeiture. They're the ones who drafted the indictment. And yet the district court judge, who's a fabulous judge, but I think he applied one standard to the government, as your question said, about not putting two and two together and somehow said that was on us to do. And I think his theory was, well, this is Shaw's money, so if it's Shaw's money, he should know about it. But the fact that, we agree, it's Shaw's property, but Shaw couldn't guess that the government's theory of forfeiture was narrower than what the indictment said. He took the indictment at its word. The fact that the property is his doesn't matter. I mean, he started Outcome Health in college. So in one sense, all of his assets could be traced to the fraud if the government's theory of fraud was the entire Outcome Health enterprise was all built on a lie. And that's exactly what they told Burke their theory was. So, you know, I think we did everything possible. By contrast, I think the government did very little. I mean, you know, the idea that they're filing a brief on the Sixth Amendment Council of Choice on February 19th and not even mentioning the email from the day before. And it's the same AUSA that signs that brief as Polking addresses that email to tells you, boy, it may not be intentional, but it's sure reckless and perhaps even knowing. Again, I don't think that matters for Sixth Amendment purposes. What really matters here is that there's a deprivation of a fundamental right. Justice Scalia's opinion in in Gonzalez Lopez, I think, is very clear that this is the kind of structural error in which it's impossible to unscramble the egg, that there's such an autonomy right that we have in our system for people to be able to spend their resources on their own defense. And here's something really grave. Is it is there any challenge before us that we don't know as we sit here now? I don't think we do the dollar amount of the over restraint in a case where at least your client's intention and your co-defendants intention was to hire a particular counsel. I know you have a backup argument, but the primary argument is that they wanted to go to trial with trial with Quinn Emanuel and McGuire Woods. We have some sense of what that would have cost, but we don't know the dollar amount of the over restraint. So I do think we do know it, but I don't think it matters for purposes of our argument. I think that the district court got it wrong by saying the burden was on the defendant, Shaw, to prove that he could have had enough money to hire Burke specifically. We think that's wrong for two reasons. One, the burden of proof undoubtedly is on the government. When it's the government's mistake, Chapman and Medina, I think, make that clear. You want to deter this kind of government wrongdoing. And it couldn't be that the burden is on him. And second, it's the totally wrong question to say, you've got to prove that Burke himself had money for it. The right is a fair opportunity to hire the counsel of choice. If he couldn't have Burke in range, undoubtedly there were other people in range. Indeed, he tried to interview many other people, as the record showed. All of them said, this isn't enough money in present dollars to hire us. That is certainly sufficient for a counsel of choice deprivation. I mean, in Luis, there was no one identified. And the idea, I mean, the government can't explain how Judge Durkin's rule makes sense. That would mean that every single defendant would have to interview all sorts of counsel that he couldn't afford simply to make a record on the theory that maybe one day the restraint will be found improper. We're here, Judge Scudder, because the government did the wrong thing. It did the wrong thing in 2019 by restraining this money improperly. And then it did the wrong thing in 2020 by not telling us about it. Had either of those things happened, and had they not restrained the money, or had they restrained the money and told us, we would have obviously come to the court and said, there's a problem here. This isn't like your usual sandbagging case in which we have some trick Sixth Amendment counsel of choice argument in our back pocket. We don't say it in the trial or anything like that. And then we spring it on the prosecution later. We made a Sixth Amendment counsel of choice argument in this case. There was no sandbagging. If there was any sandbagging, it was on the part of the government for not being forthcoming. There are no other questions on the Sixth Amendment. You say that before the trial, the government was suggesting that all of the assets necessarily were covered by the forfeiture claim. And the district judge said, no, it was the 2016 and 2017 matter. Was there anything that was said before the trial which suggested that the government was seeking forfeiture of the amounts that had been paid by the pharmacy companies? Yes, they sought, they did it, first of all. They took all of the money and they restrained all right to have an interest. Is there something concrete, they said, that would lead you to believe, would lead a reasonable person to believe, that they sought to forfeit the amounts that had been paid? By the pharmacy companies. Yes, absolutely, your honor. So the government froze in 2019, all right, title and interest. And then at the grand jury. You were not on the same wavelength. I'm not asking whether there was a general demand. Was there ever anything said about the particular sources of the money? This is why the district judge said there was a forfeiture. The district judge said the only statements about the sources of the money had to do with the 2016 bank loans and the 2017 capital. Before trial, did they mention other sources concretely? So I think they do, your honor. So this is, if you could just give me a little leeway to explain what we're saying. So the indictment says it phrases all right, title and interest. And then at the grand jury, the agent is asked about that. And it says, does that truly and accurately list all of the items for which you have probable cause? And the answer to that is yes. And then when it talks about those two examples, they said it was including but not limited to those two examples, the capital raise and the loan. So I don't know that the word pharma is specifically in, but it is in the fact that they restrained all the money. And then the government agent is saying, I have probable cause to restrain all the money, which includes the pharma money. Because that was part of what was forfeited. Now, if you thought there was some factual disagreement here, I think that would just push you into the question of whether this is structural error and Greer and cases after that suggest that it is. But I think here, the government's theory of fraud was so broad, they wanted to take all the money. They took all the money. They said they have probable cause to take all the money. And at the very same time, they have emails saying, oh, we wrongly took this much money. That's the Sixth Amendment problem. I've never seen a case of this magnitude. I understand there are edge cases in which someone's deprived a little bit of money or something like that. This made a measurable, concrete difference on something that the Chief Justice said is the most precious right a defendant has. With respect to the. You're now on Mr. Sokoloff's time. Okay. Well, if just just a few words about the 801 issue, the government here has had introduced. You should be running Mr. Sokoloff's time. The government introduced grand jury testimony from the three witnesses, the three key witnesses that were scripted and that and the motivations to lie, as our brief explains, are already all there. We think that is a very, very unusual thing and is reversible. Mr. Sokoloff. Thank you, Judge Easterbrook. Eugene Sokoloff for Shraddha Agarwal. May it please the court. The government acknowledges that failing to deliver on a promise is not fraud. It had told the jury the opposite at trial from start to finish. For a start, the government repeatedly invoked a video of Mr. Shaw telling a public audience, quote, you cannot be late in delivering what you promised. Otherwise, it's fraud. If the defendants were confused about what fraud meant, the government told the jury in rebuttal, quote, you could just use Mr. Shaw's definition. That's at 103.74. They played that video. They quoted it or referenced it at opening, from 48 to 49, in interim statements, page 66, during witness exams, 83, 81, and at closing repeatedly, 91.68, 92.36, 103.29, among others. They played the video repeatedly. Second, walking through the court's instructions, the government argued that the jury didn't need to find a cover up. It didn't need to find overbilling because, quote, what we also have here are just false promises. Anytime a projection is used and they say we are going to deliver X, and then the campaign starts and they're not delivering X, they're making a false promise about what they're going to deliver. That's at 94.16. The government made clear that that underdelivery was an independent ground. At 104.11, the government told the jury, remember the jury instruction. We only need to prove one lie or misrepresentation. Mr. Sokoloff, what's our standard of review on this? There's no objection to the jury instruction, right? And so you somehow, therefore it suggests plain error. Or you somehow have to be arguing that you can preserve the jury instruction challenge indirectly through the Rule 29 motion? So this is not a jury instruction challenge. And I think Barrera spells this out expressly, but it's also true of Blagojevich, of Hodge, and of Lee. So in Barrera, we had a situation where the defendants, several of them had actually waived even the right to plain error review. They had agreed with the jury instruction, so they couldn't get any review at all. But what this court said was by filing a motion for acquittal, the defendants, quote, are entitled to that relief because there is no way to be sure whether they stand convicted of acts that the law does not make criminal. And that's exactly the case here. There is no way even to evaluate a motion for challenging the factual sufficiency of the government's case because we cannot know what evidence the jury credited, whether it relied on the legally insufficient evidence of underperformance or whether it relied on. Then I don't understand why this is not a jury instruction question. Jury instructions might have told them to choose a theory, but if it's a Rule 29 motion for acquittal, if there's any sufficient evidence on any theory, then there's no problem. So that's what separates Rule 29 from a jury instruction complaint. Right. And Judge Eastbrook, I think Barrera takes this head on. It says that in the ordinary case where there are two theories, both of which are valid, and there's evidence on either one of them, then the verdict stands. But when one of the theories is invalid, then you cannot tell which evidence the jury would have considered, and therefore you can't speculate as to what the jury found. Gligoyevich is a great example. In that case, this court, first of all, said that the instructions. The reason you can't speculate about what the jury found is the proper instructions, proper in your terms, would have told the jury what to find. That's why this looks like a complaint about the jury instructions. So what the court said in Lee, and I think this is a helpful example, because the court says, look, the instructions here correctly instructed the jury. In that case, it was a question of what constitutes proceeds for the money laundering statute. The instructions were correct. And Gligoyevich, actually, the same comment that the court said, the instructions were otherwise unexceptionable. The problem in Lee was that the instructions were nevertheless insufficiently specific to tell the jury that some of the evidence the government had presented could support a lawful conviction and some could not. This court confronted the same issue again and again after Skilling, after the Honest Services Fraud Theory was rejected. And in case after case, this is what it said in Turner, the harmless error of question in this kind of case depends on whether, quote, the trial evidence was such that the jury must have convicted the defendants on both the valid and invalid theories of fraud. That's a 693, F3rd, 759. So whether you want to think about it as a shortcoming in the instructions, it's not a question of whether the instructions were substantively incorrect. The problem is we now are faced with a general verdict that gives us no way to distinguish between valid theory and the invalid theory the government presented. And because of that, we have a real risk that if even one juror or if some mix of jurors for the different counts adopted the government's under-delivery theory, a theory the government concedes is legally untenable, then we have convictions here where we have a lack of unanimity of proof beyond reasonable doubt on each of the elements of an actual crime. Now, turning to one save any time on any of the theories, this is a good time to do it. Uh, on Mr. Katyal briefly touched on the, uh, the question of hearsay evidence. And I think that, uh, just to follow up on that, I think the rule is pretty clear. The rule the government is proposing here in which essentially any time that, uh, a witness is challenged on anything in addition to their motive to lie, that opens the door wide, uh, to the admission of their grand jury testimony is an unworkable rule. Uh, in a situation like this where you have a witness who is brought in by the prosecution as a targeted investigation and told essentially, we need you to point the finger at somebody, of course, from the very first moment they have a motive to lie. And allowing the government in this case to bolster, uh, testimony that was tainted by that motive with more testimony that was tainted by that motive was harmful. And it was particularly harmful to miss Agrawal, given the very narrow scope of her involvement and the portion of the scheme the government relied on. Thank you, Your Honor. Thank you. Mr. Blasio. May it please the court, William Glasser for the United States. The critical problem that the defendants have in this case is that they have to overcome not only issues on the standard of review, but also clear findings by the district court that, first of all, they could have, uh, understood the over-restraint prior to trial. But they were just as well positioned as the government to understand the prior restraint, uh, the over-restraint, and the district court's... The district court's findings in that respect presume that, through careful reading, the defense could have known that only the 26 bank loan and the 27 capital were proposed for forfeiture. How would they have learned that by looking at the indictment or other statements by the prosecutor? Your Honor, there are a few ways. First of all, by looking at the indictment, they would see that the indictment only sought to restrain certain interests held by two companies, Gravitas and Jumpstart Ventures 2. There were many other assets that they held in individual accounts, in, in brokerage accounts, and even in Gravitas and Jumpstart 2 that the government did not seek to restrain. So they couldn't possibly have thought that the government was trying to restrain all of their assets. In fact, if you look at their affidavits that they executed, uh, in an attempt to obtain, uh, the settlement money before trial, those are, uh, hearing exhibits 2004 and 2005. Uh, in terms of document numbers, those are document, docket 93-1 and 93-2. In those affidavits, the defendants themselves spelled out the, uh, the assets that they had and they explained, they actually distinguished between those assets that came from the capital raise and those that came from their salary outcomes. So for example, Mr. Shaw's affidavit said that the, that some of his money had a source other than company fundraising. Uh, Ms. Agarwal's affidavit said that certain assets were quote, derived by saving my salary and not from the company's equity fundraising. So I think it's clear just from their affidavits that before trial, they understood that the government was not seeking to restrain everything they'd ever earned from outcome, which was a simple, essentially everything they'd ever earned in their lives, but was instead focusing on only certain assets held by Gravitas and Jumpstart Ventures 2. Those are the things that are in the indictment. They knew that. I think even if this court were to treat the claims here as preserved, the defendants still could not overcome the district court's factual findings with this, which this court would review for review for clear error, as I believe defendants have conceded that the government did not, uh, intentionally seek to over-restrain. We did make a mistake. Uh, we, we shouldn't have, we shouldn't have restrained some of these untraceable assets, but the district court found that the government was not only didn't intentionally do it, but actually didn't know about the over-restraint. Now, Mr. Improper restraint here, and again, these are factual findings by the district court, page 37, this is referring to the first email, nothing in this email suggested that the protective order was restraining non-traceable assets, page 39. But again, this email referring to the second email does not flag that the protective order is restraining non-traceable property. I don't think that the defendants can overcome on a clear error standard, those factual findings by the district court, which by the way, as the district court noted, uh, brought in a lot of evidence here. Actually, help me out with one thing though. It's in the, you, you acknowledge to your credit that the government shoulders responsibility for the air. And as best I can tell, it seems to be a right-hand left-hand problem. Yes. Um, that way. But it's as if the government in its next breath is saying, well, you know, we messed up. We didn't do it intentionally. Now it's up to the defendants, you know, to figure out the consequences of the mess up to sort it all out. How's, how's that a fair or proper outcome here? So your honor, I think there's a few different ways to analyze this. So let me, let me try, try a couple. So first I think is if we're looking at this in terms of preservation question, right? So in terms of the burden, uh, that, that plays into both the standard of review. So plain air waiver, et cetera, and it plays into the sort of substantive, right? I think as a matter of preservation, it obviously has to be on the defendant. And there's a few reasons why, first of all, if defendants were able to, after trial come along and say, oh, the government over restrained property, depriving me of my sixth amendment rights, I had no obligation to raise this sooner. Appellate court reviews de novo, that would put non-objecting defendants in the same exact position as objecting defendants. And that would be completely contrary to principles of plain air and rule 12. So that's the preservation side. With respect to the merit side, it is a, it is completely consistent with the way the Supreme Court has addressed every other sixth amendment claim to place the burden on the defense of showing a deprivation of a constitutional right. So Mr. Katyal cites, uh, the Chapman case and the Medina case, uh, with respect to the burden. Chapman simply says that the burden of proving harmlessness is on the government in a preserved error case. Chapman says nothing about the burden of proving a substantive constitutional violation. And Medina says we'll flip the burden and put the burden on the government when there's a case of, of government misconduct. And the district court never found government misconduct in this case. And I don't even take the defendants to be pushing a true government misconduct claim on appeal. So it's not unfair to place the burden on the defense to preserve the error and then to actually establish a constitutional violation. Now, we're not saying that they couldn't maybe establish a constitutional violation even on plain error if they can bring up enough facts to show they were deprived of a sixth amendment right. But the district court found, and we think, uh, with perfectly good reason that they didn't establish a sixth amendment violation or fifth amendment violation. And, you know, it's, it's not inconsistent with the way that the court applies, for example, ineffective assistance of counsel or any other deprivation of counsel claims to require the defendant to show a constitutional violation. And if I could just brief. Why wouldn't, but pre-trial there was a question about, um, the extent of the taint on $10.3 million. Yes. The 10.3, as I understand it traces to the money that the defendants had left over from settling claims, correct? Yes, that's right. Okay. And there was some, there was some kind of, um, you know, question about whether it's clean or it's tainted. And then that, that seems to have gotten further sorted out along the way. Why didn't that objection or that, why didn't that put the government on notice that, Hey, it's very, very clear that these defendants want to go to trial with Quinn Emanuel, the one Quinn Emanuel and McGuire Woods, we, the government should step back and make sure there's no over restraint. So your honor, that did put us on notice that that was their preferred counsel. And I think it's pretty clear that, uh, their attempt now to say, well, we, we might've chosen some other counsel. That's inconsistent with the representations below. We knew that they had, but why didn't it cause you to look at that kind of second bucket out, forget the settlement money to look at all of those other, you know, the other assets. Well, your honor, again, for the very reason that we understood the, the prosecutors understood the restraint to not, to only apply to traceable assets and their motion said nothing about the traceability of assets other than they're saying, well, because these settlement proceeds were derived from a civil settlement. They're no longer proceeds of the crime under the statute, which is just simply a frivolous argument. So it would have been great. Again, the government ought to have been more careful to ensure that the indictment and the subsequent restraining order, uh, restrained only traceable assets. Uh, it was a mistake. The district court, I think clearly found that, but even then the defendants in this case had, uh, about six and a half million dollars in liquid funds at the time the district court said, you need to have counsel by this time they obtained at least another $12 million before trial. And the district court concluded that the over restrained liquid funds would not have been enough to obtain their preferred counsel as of June, 2020, the district court also concluded that if they had tried to sell the over restrained assets, which were somewhere in the $6 million range, that they would not have been able to liquidate those funds in sufficient time to obtain counsel of choice by that June 30, 30 date. So again, these are all findings of the district court that this court, uh, at least reviews for clear error. We think that it's actually on plain error, uh, or perhaps waived entirely, but even if this court treats it as preserved, the defendants cannot show that those factual findings were clearly erroneous. How did that issue with the, with the $10.3 million? The record seems a little unclear to this on this point, in my view, and there, there was like 9.6 that was returned to the defendant, but then there was a question that came up about, well, eight, 8.4 may still be tainted. Yes. I don't want to sidetrack it. You know how all that shook out. So your honor, the numbers are a little bit confusing. I think the 10.3, uh, you can essentially set aside that 10.3 was just an amount out of about the $31 million that they were allowed to retain by virtue of the settlement. Uh, that was a separate issue. Then after trial, when new council raised the fifth and sixth amendment claim, uh, well actually before I think they even filed the new trial motion, uh, flagged this for the government, the government said, we did over restrain. So here's 9.6 back. And that was based on the tracing that the government had done as of that, that date. However, when the government obtained additional information from, uh, the, from the accounts so that they could do more detailed tracing, we realized that actually of that 9.6 million that we said was they could have back because it was over restrained, actually 8.4 of that was traceable, uh, to the fraud. So that 9.6 million, again, doesn't really matter. Is that agreed by the defendants? Uh, your honor, they had, they didn't exactly. That's the part I'm trying to figure out. Because when you're talking, when you're up into those numbers, you're, you're above the 7.8 or whatever you want to put as the kind of floor of this threshold. Right. Your honor. So I wouldn't say that they necessarily agreed to know those numbers, but here's what they did. They called an expert, uh, at the evidentiary hearing, the district court was considering the fifth and sixth amendment claims and their expert concluded that, uh, about $1.7 million of liquid funds would have been available to the defense at the time. And did not, so that's nowhere near 9.6, right? The district court explains that actually 1.7 was too high. It was at most 1.1 and out of the 9.6, right? So the 9.6, your honor was just, uh, effectively the government being, uh, over generous because of inadequate tracing and that, and that we did not seek to claw back all that amount and actually allowed that 9.6, uh, or at least part of it to be used to fund post conviction counsel. But the 9.6, I think you can set aside because that's just not an issue here. And I don't think that, um, the district court didn't, didn't consider that a relevant number. And I don't think that even the defense can explain why it is relevant. If the court has no further questions on the fifth and sixth amendment issues, uh, I just briefly touch on the introduction of the grand jury statements as prior consistent statements. The district court did not abuse its discretion in introducing these, uh, statements as prior consistent statements. But even if this court were to have questions about whether it were an abuse of discretion, it was clearly harmless to introduce as prior consistent statements, these brief grand jury statements in the entire context of this trial, these were prior consistent statements, which means that they were both adopted by the witnesses in their trial testimony and were consistent with their testimony on direct. And the defense attempt to show that they were somehow harmed by the introduction of these exhibits fails. Why did the district court not abuse discretion in admitting these statements? So I've actually never heard of anything like this. Sure. Uh, your honor, the district court did not abuse its discretion under rule 801 D1 B1 because it appropriately concluded that the statements that the witnesses made to the grand jury were before the charged or alleged motivations to lie arose. Now it's true that two of these witnesses had immunity letters before their grand jury testimony, but they were impeached extensively at trial based on motives to lie that arose after their grand jury testimony. So for example, Ketchum was impeached based on the fact that he had received statutory immunity, which the defense characterized as the quote ultimate get out of jail free card the day before his trial testimony. So when there's impeachment like that, that arises after the grand jury statements, the district court appropriately concluded that it's permissible to show that even before he received statutory immunity, Mr. Ketchum made consistent statements. Uh, another example is Mr. Desai. So is that too discounting the effect of the immunity letter though for Ketchum and who's the other guy, David Ma? That's right. It's not, it's not discounting the effect of the immunity letter because the, they were both thoroughly cross-examined on their immunity letters and even cross-examined about their credibility in front of the grand jury. So everything came out. And I think the key to rule 801 D1 B is the truth seeking function to determine whether or not when someone makes a statement at trial, they are lying or not. And when a party charges that someone is lying at trial based on something that happened recently, the rule uses the term recent, the other party that has proffered the witness can show that actually that person made statements consistent with their trial testimony before that alleged motivation. That's all that happened here. And that was appropriate under the text of the rule. And the defense cannot show any, uh, you're relying upon little, little eye or, or the double eye. So I think your honor, little, little eye, uh, is the, is the best way to understand this, this case. I think the, the dispute about, uh, about, uh, sub two, um, has narrowed a bit after the reply brief. So I think we both, both parties agree that the fifth circuits Portillo approach of saying you can't just drag in everything by virtue of little to, uh, we, we agree with that. We understood in the opening brief, the other side to be saying that the pre motive requirement of Tome applies to a sub two in every instance, which can't possibly be right. But we, I think both parties agree with the fifth circuit that district courts can sort of sort things out and determine whether something is being brought in, uh, to, uh, rebut an allegation of improper motive or is being brought in for some other purpose. But in any event, even if there were an abusive discretion, as I mentioned earlier, uh, any error would be harmless. Finally, with respect to the theory of the case, as the defense tries to challenge it, the defense never objected to the jury instructions on the basis that they raise in their opening brief, never objected in their rule 29 motions on this basis, and never objected to the government's closing argument when the government, uh, allegedly, uh, propounded an improper theory. So this claim cannot possibly have been preserved. Now the defense relies on this court's Barrera decision, which to the extent Barrera holds that merely raising a rule 29 motion without identifying any error in the theory or of the government's case or in the jury instructions is enough to sort of preserve any later derived objection to the theory. To the extent this court held that in Barrera, it's just wrong and inconsistent with Supreme Court precedent. Uh, this, there's no possible way to create an exception under rule 52B for errors in the jury instructions or the theory of the case simply by virtue of someone saying the evidence is insufficient to convict me under rule 29. So unpreserved, it's before this court on plain error, there was no error in the government's theory. The defense, uh, plucks one quote out of a seven hour closing argument to say that the government advanced a theory that near under delivery, uh, constitutes fraud. But that one line out of a seven hour closing doesn't overcome the jury instructions and it doesn't overcome the government's repeated reference to its true theory of the case, which was quote, inflate, under deliver, conceal. That was the government's theory that this wasn't just under delivery, which both parties agree is not alone sufficient to show fraud, but was in fact, in fact, the defendants inflated their inventory in order to deceive their clients into entering extremely large contracts. They consistently under delivered and then they concealed that under delivery, not only in their affidavits where they said that they had complied, uh, where outcome employees said the outcome had complied with its contracts, but also in covering up the fraud, uh, throughout the process of obtaining additional loans. Can I, can I restate that to you in different words and tell me whether, um, it, it seems to me that one of the, one of the real barriers the defendants have is somehow convincing us that the fraud wasn't complete on the front end at the time the misrepresentations were made to sell the advertising revenue, even though they may have harbored an intent to kind of make it up on the back end or to close the gap or the Delta. Your Honor, I think that's right. So it's very possible that when the defendants first entered into some of these contracts, they actually fought and hoped that they would be able to, uh, to perform as required under the contract. But after years and years and years of under delivery, they could no longer be under that false impression that they would be able to perform on these contracts. And yet what if they were though, your Honor, if they, if they truly thought that they not, not just sort of a vague hope, but if they truly were confident, truly thought that when they entered into each of these contracts, no, we will perform according to the terms of this contract, then I don't think that the government would be able to show that they acted with intent to defraud. But the jury found that they acted with intent to defraud. There was no error in the jury instructions on that point. And so there wasn't a reversible error in this trial. And again, because this is unpreserved, they have, it's their burden to show that, um, any error in the government's theory, uh, what prejudiced them, and it's also their burden to show that this court should exercise its discretion under the fourth plane error prong and reverse, and it would not be appropriate for this court to reverse a trial of this nature based simply on these new objections were raised post-trial. Thank you, counsel. Mr. Katyal and Mr. Sokoloff, you have 30 seconds between you, but I will extend that to two minutes between you. Thank you, your honor. We agree with judge Kersh that in, with respect to 801, we've never seen anything like this. It would mean the government would get a wholesale ability to draft grand jury statements and introduce them later. And we agree with judge Scudder that we've never seen anything that looks like this with respect to a sixth amendment deprivation. Now, judge Easterbrook, you asked me about the pharma counts in the indictment, uh, and whether we were on notice. Pharma was specified in the indictment itself. This is document 14 at page 49, quote, upon conviction of counts one to five, among others, the defendants shall forfeit property, including, but not limited to counts one to five are the pharma counts. The affidavits and other things he's referring to, he says that the district court rejected the emails, but if the emails weren't enough to put the government on notice, then it certainly wasn't enough to put the defense on notice. So this argument boomerangs against them. Our counsel Burke was highly motivated to stay in the case and to make a sixth amendment council of choice motion as he did in 2020 and Burke even testified to that. And as judge Scudder says, the 2026 amendment motion put the government on notice and yet it did nothing. The government engaged in and in wrongdoing here, whether it was in. Thank you. No, the time has expired. You had two minutes between you. Uh, the case has taken under advisement.